UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

───────────────────────────────────────────────

Progressive Preferred Insurance Company,                File No. 19-cv-2536 (ECT/LIB)

          Plaintiff,

v.

          **OPINION AND ORDER**

Estate of Bradley D. Stover and
Casey J. Talberg,

          Defendants.

───────────────────────────────────────────────

Beth A. Jenson Prouty and Stephen M. Warner, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, MN, for Plaintiff Progressive Preferred Insurance Company.

Christopher A. Johnston and Christopher P. Martineau, Johnston Martineau PLLP, Roseville, MN, for Defendant Estate of Bradley D. Stover.

───────────────────────────────────────────────

      The primary issue in this insurance-coverage case is whether Defendant Casey J. Talberg's exchange of his pickup truck for a woodchipper was a "sale or transfer" of the truck. If it was a "sale or transfer" of the truck, then Plaintiff Progressive Preferred Insurance Company has no liability for a demand made by the Estate of Bradley Stover for the policy's $250,000 per person liability limits. Stover died while riding as a passenger in the pickup truck after the truck-for-woodchipper trade. If, on the other hand, the trade was not a "sale or transfer," then Stover's Estate may continue to pursue its demand for the policy limits, though Progressive argues that policy exclusions would bar the Estate's claim regardless. Progressive and the Estate have filed competing summary-judgment motions.

Progressive's motion will be granted, and the Estate's motion denied, because there is no genuine fact dispute that Talberg "sold" the truck when he traded it for the woodchipper.

I

The Parties stipulated to the following facts:  Stip. [ECF No. 52].[1]

*The crash that killed Stover.*  On August 25, 2018, Bradley Stover was the passenger in a 2005 Chevrolet Silverado pickup driven by his brother-in-law, Ronald Girtz, in Ankeny, Iowa. *Id.* ¶¶ 1–2.  Girtz lost control of the truck, causing it to crash and roll, and Girtz and Stover died in the crash. *Id.* ¶¶ 3–4.  The driver of a separate vehicle, Brandon Ferin, pleaded guilty to two crimes for his role in the crash that killed Girtz and Stover: (1) Homicide by Vehicle under Iowa Code § 707.6A.3 and (2) Involuntary Manslaughter under Iowa Code § 707.5(1)(b). *Id.* ¶¶ 5, 13.  At his plea hearing, Ferin recounted the crash and events leading to it.  According to Ferin, Girtz pulled alongside Ferin's vehicle while Ferin was stopped at a stoplight, at which point there "was some revving of engines." *Id.* ¶¶ 7, 10.  Ferin and Girtz then raced their vehicles. *Id.* ¶ 9.  After Girtz had pulled well ahead,

---

[1]   In their stipulation, the Parties agree that, if it is determined that the case cannot be resolved on summary judgment, then "[t]he Court may then decide the case" on the basis of the "case stated before it, . . . draw[ing] such inferences as are reasonable to resolve the case." Stip. at 1 (quoting *Cranmore v. Wells Fargo Bank, N.A.*, 410 F. Supp. 3d 336, 340 (D. Mass. 2019) (quoting *Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 234–35 (D. Mass. 2003))).  If the Estate prevails, Progressive agrees it "will not appeal and will pay its [policy] limits of $250,000 within 15 days of the order[.]" *Id.*  "In exchange[,] the Estate will not pursue Talberg or the Estate of Ron Girtz personally." *Id.*  On the other hand, "if Progressive prevails . . . the Estate will not appeal and will not pursue Talberg or the Estate of Ron Girtz personally." *Id.*  Talberg is in default, ECF No. 22, but that seems of no consequence in light of the Parties' stipulation.  The Parties are commended for their advocacy and for their creative and collaborative-but-adversarial approach to achieving the efficient determination of this action.  Fed. R. Civ. P. 1.

2

Girtz lost control and rolled the truck while attempting to avoid a turning vehicle. *Id.* ¶ 10. According to Ferin, he and Girtz were "participating in a speed exhibition" and "drag racing" at the time of the crash. *Id.* ¶ 11. Ferin further admitted that the drag racing was "unlawful activity" and "likely to cause a death or serious injury." *Id.* ¶ 14.

*The truck-for-woodchipper trade.* The central legal issue in this case concerns how Girtz acquired the truck. Talberg owned the truck. *Id.* ¶ 16; Second Am. Compl. ¶ 17 [ECF No. 17]; Ans. to Second Am. Compl. ¶ 17 [ECF No. 18]. Girtz knew Talberg because Talberg had lived on and off with Girtz's daughter, Brittnie, for between twelve and fifteen years. Stip. ¶ 18. At some point, "Girtz began pestering Talberg non-stop to trade" the truck for a woodchipper Girtz owned. *Id.* ¶ 34. Girtz pestered Talberg to agree to the trade in text messages, phone calls, and "every time he came over." *Id.* ¶ 35. "[Girtz] was relentless." *Id.* Talberg eventually relented and agreed to the trade, but Talberg "would not let Girtz have the truck unless there was an agreement where Talberg was no longer the owner of the truck." *Id.* ¶¶ 36, 39. "Brittnie Girtz drafted an agreement and Talberg and Girtz both signed it at the same time." *Id.* ¶ 40. The agreement reads:

> I Casey Talberg sold my 2005 Chevy Truck to Ron Girtz on July 23rd 2018. I sold it to him as is. I am no longer responsible for the vehicle as of today.
>
> Also waiting on the title.
>
> *Ronald Girtz*
> *Casey Talberg.*

*Id.* ¶ 41; *see* Prouty Decl., Ex. 4 [ECF No. 32-1 at 58]. Within a week of signing the agreement, Talberg retrieved the woodchipper "from a friend of Girtz." Stip. ¶ 45. After

3

signing the agreement, Girtz drove the truck to Iowa, where he was working. *Id.* ¶ 46. "Talberg never drove the Truck again." *Id.* ¶ 47. "If Talberg had wanted to drive the [t]ruck, he would have had to ask Girtz's permission." *Id.* ¶ 48.

*Talberg's actions after the crash.* At least up to the truck-for-woodchipper trade, Progressive insured the truck under a policy issued to Talberg. *See* Second Am. Compl. ¶ 20; Ans. to Second Am. Compl. ¶ 20; Prouty Decl., Ex. 7 [ECF No. 32-1 at 70]. However, Talberg did not notify Progressive about the exchange until after Girtz and Stover's fatal crash. Stip. ¶ 54. Talberg telephoned Progressive to report the crash and said, among other things, ". . . my truck was in an accident." *Id.* ¶¶ 55–56. After learning of the crash, Talberg also telephoned his insurance agent and asked to have the truck removed from the Progressive policy effective August 26, 2018, the day after the crash. *Id.* ¶ 57. Though "Talberg was aware that there is a process that has to be gone through to transfer a [motor vehicle's] title[,]" he has not transferred the truck's title, and title remains in his name. *Id.* ¶¶ 43–44; Second Am. Compl. ¶ 17; Ans. to Second Am. Compl. ¶ 17.

II

Summary judgment is appropriate where a movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its]

favor." *Id.* at 255 (citation omitted).  Courts take a slightly modified approach where, as here, there are cross-motions for summary judgment.  *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).  When considering Progressive's motion, the record must be viewed in the light most favorable to Stover, and when considering Stover's motion, the record must be viewed in the light most favorable to Progressive.  *See id.*

There is diversity jurisdiction over this case under 28 U.S.C. § 1332.  Progressive alleges that it "is a corporation organized under the laws of Ohio with a principal place of business located in Ohio."  Second Am. Compl. ¶ 4.  Talberg, Stover, and Stover's Estate are citizens of either Minnesota or Iowa.  *See id.* ¶¶ 5, 6; Answer to Second Am. Compl. ¶¶ 5, 6; Civil Cover Sheet [ECF No. 1-3]; Prouty Decl., Ex. 1 [ECF No. 32-1 at 5].  Federal courts sitting in diversity apply state substantive law.  *Morgantown Mach. & Hydraulics of Ohio, Inc. v. Am. Piping Prods., Inc.*, 887 F.3d 413, 415 (8th Cir. 2018) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

This action turns on the construction of an insurance policy issued in Minnesota, to a Minnesota citizen, covering a motor vehicle registered in Minnesota.  *See* Prouty Decl., Ex. 7 at 1; Second Am. Compl. ¶ 5; Stover Aff., Ex. A [ECF No. 39 at 3].  The Parties agree Minnesota law governs.  *See* Pl. Mem. in Supp. at 9–10 [ECF No. 31]; Def. Mem. in Supp. at 3–4 [ECF No. 35].  Therefore, Minnesota law will be applied here.  *See Netherlands, Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies . . ."); *see also Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010).

In applying Minnesota law, a federal district court sitting in diversity "must predict how the Supreme Court of Minnesota would rule, and . . . follow decisions of the [Minnesota Court of Appeals] when they are the best evidence of Minnesota Law." *Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) (quoting *Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948, 951 (8th Cir. 2012)). Under Minnesota law, "[i]nterpretation of an insurance policy and application of the policy to the facts in a case are questions of law[.]" *Am. Fam. Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001). Words are given their "natural and ordinary meaning" and ambiguities regarding coverage are "construed in favor of the insured." *Id.* But a court may not create ambiguities where none exist. *Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co., Inc.*, 825 N.W.2d 695, 706 (Minn. 2013).

Progressive first argues that the policy's "Automatic Termination" provision bars coverage. The provision says, in relevant part:

> Automatic Termination
> …
> If a covered auto is *sold or transferred* to someone other than you or a relative, any insurance provided by this policy will terminate as to that covered auto on the effective date of the *sale or transfer*.

Prouty Decl., Ex. 7 at 109 (emphasis added). The Parties' agree that the truck was a "covered auto" at all relevant times and that Girtz was "someone other than you or a relative." As noted, the Parties dispute whether the truck-for-woodchipper trade resulted in the truck being "sold or transferred" within the meaning of that phrase in the automatic termination provision. Progressive argues that the trade was a "sale or transfer" as those

6

words ordinarily are defined and, therefore, that its coverage of the truck automatically terminated on July 23, 2018, when Talberg traded the truck to Girtz. Pl. Mem. in Supp. at 11–14; Pl. Mem. in Opp'n [ECF No. 48] at 1–6. The Estate argues essentially that, for there to have been a "sale or transfer" of the truck, the formal transfer of legal title must have been completed (or at least begun) in compliance with Minnesota law—specifically Minn. Stat. § 168A.10; since everyone agrees that never happened, the Estate says, the truck was not "sold or transferred" within the meaning of the automatic termination provision. Def. Mem. in Supp. at 3–5; Def. Mem. in Opp'n [ECF No. 51] at 3–4.

The policy does not define the phrase "sold or transferred"; the task, then, is to determine the plain and ordinary meaning of "sold or transferred." When interpreting insurance policies, Minnesota courts do not consider words or phrases in isolation, but rather in the context in which they are used. *L.H. Bolduc Co., Inc.*, 825 N.W.2d at 706. "The sense of a word depends on how it is being used; only if more than one meaning applies within that context does ambiguity arise." *Bd. of Regents of Univ. of Minnesota v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 892 (Minn. 1994). "Sell" commonly means "to exchange or deliver for money or its equivalent." *Sell, American Heritage Dictionary of the English Language* (5th ed. 2020); *see also Barrow v. State*, 862 N.W.2d 686, 689–90 (Minn. 2015) (noting that "sell" ordinarily means "to give up property to another for money or other valuable consideration") (quoting *Webster's Third New International Dictionary of the English Language, Unabridged* 2061 (2002)). Consistent with these definitions, a "sale" may occur without the prior or contemporaneous completion of forms or other documents that are required to formalize or record the transaction with the government (or

7

another third party). The Minnesota statute relied on by the Estate confirms this understanding. That statute requires a vehicle owner to, "[w]ithin ten days of the date of *sale*, other than a *sale* by or to a licensed motor vehicle dealer" complete and return the paperwork necessary to transfer title to the Department of Public Safety, Driver and Vehicle Services Division Motor Vehicles. Minn. Stat. § 168A.10, subd. 1 (2019) (emphasis added). The Estate is correct that Minnesota's title-transfer requirements have been examined by courts to identify a vehicle's owner for purposes of vicarious liability under Minn. Stat. § 168A.10, subd. 5, or to protect third-party lenders that relied on an untransferred certificate of title. In vicarious-liability cases, the name on a valid certificate of title establishes a presumption of ownership of a motor vehicle, rebutted by extrinsic evidence that "a *sale* had in fact occurred." *Arneson v. Integrity Mut. Ins. Co.*, 344 N.W.2d 617, 618 (Minn. 1984) (emphasis added); *see also Bank N. v. Soule*, 420 N.W.2d 598, 603 n.7 (Minn. 1988) (finding a "sale" had occurred, as between buyer and seller, "notwithstanding no transfer of certificate of title"); *BLC Ins. Co. v. Vivent*, 359 N.W.2d 315, 316 (Minn. Ct. App. 1984) (finding car sale had occurred despite no title transfer, thereby defeating subrogation claim against the named titleholder). The lesson of these cases seems clear: though title transfer may evidence a sale, it is not a prerequisite to finding that a sale occurred. *E.g.*, *Vehicle Title Transfer*, Driver and Vehicle Services, Minnesota Department of Public Safety, https://dps.mn.gov/divisions/dvs/Pages/vehicle-title-transfer.aspx ("A certificate of title is proof of ownership.").

Here—having determined that a "sale" occurs when one exchanges something for money or its equivalent, and that, in the case of motor vehicles, the filing or completion of

forms or other papers is not a prerequisite to determining that a "sale" occurred—there is no genuine fact dispute about whether the truck-for-woodchipper exchange was a "sale" of the truck to which the policy's automatic termination provision applied. A series of stipulated facts establish the absence of a genuine fact dispute: (1) Talberg traded the truck for the woodchipper; (2) Talberg, aware of Girtz's past legal problems, would not allow Girtz to have the truck without a written agreement making clear that "Talberg was no longer the owner of the truck[]"; (3) Talberg and Girtz signed an agreement stating in relevant part that "I Casey Talberg sold my 2005 Chevy Truck to Ron Girtz on July 23rd 2018. I sold it to him as is. I am no longer responsible for the vehicle as of today . . . ."; (4) Talberg took possession of the woodchipper within a week after signing the agreement; (5) Girtz, after signing the Agreement, drove the truck to Iowa where he was working; (6) Talberg never drove the Truck again; and (7) Talberg would have had to ask Girtz's permission to drive the truck after that. Stip. ¶¶ 36–48. The Estate suggests that Talberg's delay in formally transferring title to Girtz and notifying Progressive of the sale, and his "financial inability" to pay a loan on the truck might show that Talberg did not intend to follow through on the sale. Def. Mem. in Supp. at 5; Def. Mem. in Opp'n at 4. Against the stipulated facts, observations about whether Talberg may have had second thoughts do not undermine the conclusion that a sale occurred. That a seller might be remorseful does not mean no sale occurred. Regardless, it requires speculation to infer that Talberg was remorseful from the cited facts, and that's not enough to defeat summary judgment on this record. *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006) ("[Plaintiff]'s speculation and conjecture are insufficient to defeat summary

9

judgment."). Because there is no genuine dispute as to whether Talberg sold the truck to Girtz, coverage under the Progressive policy terminated automatically prior to the August 23, 2018 crash. The Estate has no claim on the policy, and summary judgment will be entered for Progressive on this basis.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. Plaintiff's summary-judgment motion [ECF No. 28] is **GRANTED**.

2. Defendant Estate of Bradley D. Stover's summary-judgment motion [ECF No. 35] is **DENIED**.

3. This action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 9, 2020

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court